**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| KENNETH SHANE HURT, | : | Case No. 1:17-cv-542 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| NORFOLK SOUTHERN RAILWAY COMPANY, | : | |
| | : | |
| Defendant. | : | |

---

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DOC. 11)**

---

This case is before the Court on the Motion for Summary Judgment (Doc. 11) filed by Defendant Norfolk Southern Railway Company ("NSR"). Plaintiff Kenneth Shane Hurt ("Hurt") alleges that NSR, his former employer, unlawfully terminated him for participating in an investigation into alleged gender, disability and medical leave discrimination at NSR. (Doc. 1 at ¶ 21.) NSR argues the undisputed facts show that Hurt, following an investigatory hearing, was found to have violated important safety rules and endangered his own safety while using a brake stick on a moving car. According to NSR, Hurt was terminated due to this violation and related acts of insubordination. Hurt opposes NSR's Motion, which is fully briefed and ripe for review. (*See* Docs. 18, 20.)

For the reasons below, Hurt has not come forward with evidence creating a genuine issue precluding summary judgment in NSR's favor. The Court therefore

**GRANTS** the Motion for Summary Judgment and **TERMINATES** this action.

## FACTS

The following facts are undisputed, unless otherwise noted.

### A.    Hurt's Employment with NSR

NSR hired Hurt in 2007 as a conductor.  (Doc. 11-1 at PageID# 70.)  Early in his career, Hurt was disciplined four times by NSR.  (*Id.* at PageID# 75-76.)  These incidents included a 30-day suspension for failure to follow management direction; causing a derailment; a violation where he dismounted a moving engine; and running through a switch.  (*Id.* at 71-75.)  Between May 12, 2011 and March 11, 2016, NSR did not document any rule violations by Hurt.  (*Id.* at PageID# 522-23.)  Hurt worked primarily out of NSR's Sharonville yard, where he would deliver train cars to NSR's various customers.  (Doc. 13 at PageID# 1634).  The Sharonville yard is a satellite of, and considered part of, the Cincinnati terminal.  (*Id.* at PageID# 1627.)

### B.    Hurt's Co-Worker Files Charges of Discrimination and Retaliation

In November 2015, Crystal Glaser, one of Hurt's fellow conductors, was assigned a trainee during one of her first shifts back to work from a recent FMLA leave.  (Doc. 17-2 at PageID# 2706.)  While she was working with the trainee, an NSR trainmaster stopped and disciplined her for violating a rule that required conductors to keep conductor trainees within arm's reach.  (Doc. 17-2 at PageID# 2708.)  Glaser disputed the discipline, but it was upheld following a disciplinary hearing.  (Doc. 17-2 at PageID# 2910.)  Glaser subsequently filed a charge of discrimination and retaliation with the Ohio Civil Rights Commission ("OCRC") and Equal Employment Opportunity

Commission ("EEOC") on November 24, 2015. (Doc. 11-1 at PageID# 531.)

On December 18, 2015, Hurt was assigned a conductor trainee for the day. A different NSR trainmaster stopped him for allegedly violating the same rule requiring him to keep his trainee within arm's reach. (Doc. 11-1 at PageID# 82.) Hurt told the trainmaster that he was never made aware of such a rule and asked to see the rule, but the trainmaster was unable to produce it in writing. (*Id.* at PageID# 85.) The trainmaster ultimately issued Hurt no discipline. (*Id.*)

Shortly thereafter, Glaser learned that Hurt had been stopped for violating this same rule, but not issued discipline. During a conversation in the breakroom, Glaser told Hurt that she was being discriminated against, and Hurt agreed to serve as a witness and provide a statement in support of Glaser's charge of discrimination. (Doc. 11-1 at PageID# 89.) Hurt then provided Glaser a handwritten statement indicating that he did not receive any discipline when he was stopped for violating the arm's length rule. (*Id.* at PageID# 95-96.)

Later in December 2015, Glaser approached Tom Merrell, Assistant Terminal Superintendent, about the disparate treatment she was experiencing. Glaser told Merrell that she had filed a charge of discrimination, in part, based on the discipline she received for violating the arm's reach rule. (Doc. 17 at PageID# 2397-2399.) She also told Merrell that Hurt and another employee had agreed to serve as witnesses for her because they were stopped for violating the same rule but not issued discipline. (*Id.*)

### C.    Hurt Tells Co-Workers About His Offer to Provide Testimony

Hurt testified that his agreement to testify on Glaser's behalf would have quickly

spread around the railroad.  (Doc. 11-1 at PageID# 98-99.)  Hurt told Bob Munch, the local union chairman, Danny Kelly, an engineer at NSR, and Mark Stromburg, a yardmaster, that he had agreed to testify as a witness and had given Glaser a statement.  (*Id.* at PageID# 97.)   And Hurt was told by numerous coworkers—Dee Redmond, Danny Kelly, Brad Hinsley, Bob Munch, and Kenny Withrow—that he would have a "target" on his back if he testified for Glaser.  (*Id.* at PageID# 125.)  Hurt also knew from experience that trainmasters and yardmasters could listen to conversations among the bargaining unit employees in the breakroom via a two-way radio.  (*Id.* at PageID# 131-132.)  Hurt had no evidence, however, that any particular trainmaster or yardmaster heard any particular conversation over the two-way radio relating to Hurt's offer to provide testimony for Glaser.  (*Id.* at PageID# 133-135.)

Hurt also testified that, after agreeing to serve as a witness for Glaser, trainmasters began to watch him more frequently while he worked.  (Doc. 18-1.)

### D.  Hurt Violates Rule Prohibiting Tying of Handbrake on Moving Train

On March 11, 2016, Hurt and another conductor were tasked with taking a train of cars to a customer's facility from the Sharonville yard.  After arriving at the customer facility, Hurt and the other conductor dismounted the train and began using a remote-controlled system to control the train's movement.  (Doc. 11-1 at PageID# 183.)  As the train was moving at about one mile an hour, Hurt used his brake stick[1] to apply the handbrake on one of the train cars.  (*Id.* at PageID# 183-185, 203.)  Hurt was three feet

---

[1] A brake stick is an extendable pole that conductors can use to manipulate the handbrake wheels on the train cars from the ground.

from the train and side stepping along as it slowly moved to its final location. (*Id*. at PageID# 186-188.)

A trainmaster called over the radio for Hurt to stop the train. (*Id*. at PageID# 183). Two trainmasters, Timothy Tucker and Joe Stuckey, walked over to Hurt and asked him if he was aware that he had violated a safety rule regarding tying a hand brake from the ground while equipment was moving. (Doc. 11-1 at PageID# 214.) Hurt was unaware that NSR's rules prohibited the use of a brake stick to tie a handbrake while the train was moving. (*Id*.) Tucker and Stuckey also accused Hurt of "fouling" the train, meaning he placed his body in close enough proximity to the train that he could be struck by it while it was moving. (Doc. 13 at PageID# 1643.) Hurt denies that he was close enough to the train to be struck. (Doc. 11-1 at PageID# 188-191.)

The trainmasters asked Hurt if he could continue to work safely that evening. (*Id*. at PageID# 216.) Hurt told them that he could work safely, but also said that he had a lot on his mind because his wife was ill. Hurt suggested that perhaps he should stop working for the night. (*Id*. at PageID# 217-220.) Tucker and Stuckey stepped away to call Merrell to tell him about what was going on with Hurt. (Doc. 11-2 at PageID# 757.)

Tucker and Stuckey then took Hurt and the other conductor back to the yard office. (Doc. 11-1 at PageID# 238-239, 496.) Once inside, Tucker showed Hurt a copy of the rule regarding using a brake stick on a moving train, and then Stuckey asked Hurt to provide a written statement of the incident. (*Id*. at PageID# 238, 558.) Hurt refused and asked for union representation before providing the statement. (*Id*. at PageID# 242-244.) In response, Stuckey told Hurt that he could not have representation before

5

writing the statement. (*Id*. at PageID# 238-239.)

Tucker and Stuckey then told Hurt to sit in a corner in the trainmaster's office. Hurt asked to have a fellow employee present as a witness, but Tucker and Stuckey refused. (*Id*. at PageID# 247-248.) Hurt felt unsafe being corralled into a corner and called out for the yardmaster in the next room to call 911. (*Id*. at PageID# 248-250.)

At that point, Stuckey went outside to call Merrell again to provide an update on what was happening with Hurt. (*Id*. at PageID# 259-263; Doc. 11-2 at PageID# 757; Doc. 15 at PageID# 2028.) As he left, Stuckey instructed Hurt to stay in the office, which Hurt claims to have understood to mean the yard office building (not the particular interior office where Tucker and Stucky had placed him). (Doc. 11-1 at PageID# 260-261.) Once Stuckey was outside, Hurt went to his locker, located his cell phone, and called his union representative, who did not answer. (*Id*. at PageID# 262.) After Stuckey returned to the trainmaster's office from calling Merrell, he instructed Hurt to clock out and go home. (*Id*. at PageID# 273.) Tucker accompanied Hurt to his vehicle and told Hurt that he was being removed from service pending an investigation. (*Id*. at PageID# 438.)

### E. NSR Terminates Hurt's Employment

In a letter dated March 16, 2016, NSR notified Hurt that it was conducting an investigatory hearing into his responsibility for "1) Endangering your own safety when you fouled coupled moving equipment to tie the handbrake with a short brake stick while walking backwards, and using your Operator Control Unit to control the movement on Remote Control Locomotive NS 5227, and 2) Failure to follow the

instructions of Trainmaster Joe Stuckey to provide a written statement regarding a matter under investigation, and 3) Failure to follow instructions from Trainmaster Joe Stuckey when you were instructed to stay in Trainmaster Stuckey's office during an interview regarding an incident under investigation, on March 11, 2016, between approximately 6:40 PM and 7:20 PM, at Vogt Warehouse (F30) and Sharon Yard, in Cincinnati, Ohio, while working as Brakeman…." (Doc. 11-1 at PageID# 614.)

On April 5, 2016, NSR held the investigatory hearing. (Doc. 15-1 at PageID# 2149.) Merrell served as the hearing officer. (Doc. 14 at PageID# 1916-1917.) Hurt, Stuckey, Tucker, and another witness provided testimony. Hurt admitted at the hearing (and at his deposition in this case) that his conduct in tying the handbrake violated the applicable safety rule. (*Id*. at 232-33; Doc. 11-3 at PageID# 874.) Hurt has consistently denied that he engaged in insubordination.

After the hearing, Merrell found that Hurt was guilty of all three violations and recommended that NSR terminate Hurt's employment. Superintendent Carl Wilson reviewed the evidence adduced at the hearing along with Merrell's recommendation and made the final decision to fire Hurt. Accordingly, by letter dated April 19, 2016, Merrell notified Hurt that he was found guilty of all violations and that his employment was terminated. (Doc. 11-1 at PageID# 617.)

### F. A Public Law Board Determines Hurt's Termination Was Based on Sufficient Evidence Following a Fair and Impartial Hearing

Following the April hearing, Hurt's union appealed the termination decision through multiple levels at the company and finally to the Public Law Board (PLB)—the

organization that hears union grievances.  (*Id.* at PageID# 860-61; Doc. 11-7.)  Hurt was present at the PLB hearing and the PLB, consisting of a neutral member, a union member, and an NSR member denied Hurt's appeal.  (*Id.* at PageID# 863.)  The PLB stated "[G]iven the egregious nature of Claimant's actions, dismissal was wholly justified."  (Doc. 11-7.)  The PLB also found that Hurt was afforded a "fair and impartial hearing."  (*Id.*)

On September 7, 2016, Hurt filed a charge of retaliation with the OCRC.  (Doc. 11-1 at PageID# 633.)  On May 18, 2017, the OCRC found no probable cause to issue an administrative complaint and dismissed the charge.  (*Id.* at PageID# 633, 648.)

### G. Hurt's Complaint

Hurt asserts one claim against NSR of retaliation for engaging in protected activity under Title VII, 42 U.S.C. § 2000e *et seq.*, the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101, and the Ohio Civil Rights Act.  (Doc. 1 at ¶ 20-26.)

### LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Hancock v.*

*Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A *Wright & Miller, Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the factfinder. *Id.* However, the mere existence of a scintilla of evidence in support of the nonmoving

party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id*. The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id*.

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091 (1990). Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

## ANALYSIS

As mentioned, Hurt brings only one claim in this lawsuit—a claim for retaliation under federal and state law. Because Hurt does not have direct evidence of retaliation, he must prove his claim through indirect evidence. Employment-based retaliation claims are evaluated under the familiar three-part burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). Although Hurt brings his claim pursuant to federal and state law, both parties agree and have argued that it may be analyzed exclusively under the *McDonnell Douglas* framework.

A.      **Whether Hurt Can Establish a Prima Facie Case of Retaliation**

A prima facie case of retaliation requires a plaintiff to demonstrate that (1) he engaged in protected activity; (2) the activity was known to the defendant; (3) plaintiff subsequently suffered an employment action that a reasonable employee would have found materially adverse; and (4) there was a causal connection between the protected activity and the adverse employment action. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).

1.      **Evidence that Hurt Engaged in Protected Activity**

NSR argues that Hurt never engaged in protected activity. Hurt contends that his agreement to provide testimony in support of his co-worker's charge of discrimination was protected activity.

The Sixth Circuit has explained that an employee need not file a formal complaint to engage in protected activity—rather "it is the assertion of statutory rights" that triggers statutory protection. *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (internal quotes omitted) (quoting *EEOC v. Romeo Community Schs.*, 976 F.2d 985, 989 (6th Cir. 1992)). Title VII forbids an employer from "discriminat[ing] against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII] [the so-called 'opposition clause'], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII] [the so-called 'participation clause']." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 719–20 (6th Cir. 2008) (internal quotes omitted) (quoting 42 U.S.C. § 2000e–3(a)). The Sixth Circuit also has

11

acknowledged—although the issue was not immediately before them—that acting as a witness in an EEOC proceeding may constitute protected activity. *See Mulhall v. Ashcroft*, 287 F.3d 543, 545-46 (6th Cir. 2002) (citing 42 U.S.C. § 2000e-3(a)).

Here, it is undisputed that Hurt agreed to act as a witness for Glaser and that Glaser filed a charge of discrimination with the OCRC and EEOC. As NSR notes, Hurt never actually testified in any proceeding, although he did provide a written statement to her. NSR argues that merely providing information to Glaser and agreeing to testify on her behalf is not substantial enough activity to constitute protected activity. The cases that NSR cites, however, are distinguishable. *See Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice); *Balding-Margolis v. Cleveland Arcade*, 352 Fed. Appx. 35, 45 (6th Cir. 2009) (vague claim in affidavit to have reported sex and age-based harassment, which was not supported by record evidence and was contradicted by plaintiff's prior deposition testimony, insufficient to establish plaintiff engaged in protected activity); *Booker v. Brown and Williamson Tobacco, Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (vague allegation to manager of ethnocentrism insufficient to constitute protected activity). All of these cases stand for the general proposition that a plaintiff cannot rely upon vague claims of discrimination as protected activity. Here, however, Glaser filed an actual claim of discrimination and Hurt provided a written statement to her in support of that claim.

Moreover, federal courts have construed Title VII's anti-retaliation provision to offer exceptionally broad protection. *See Carpenter v. Mississippi Valley State Univ.*, 807 F.

12

Supp. 2d 570, 592 (N.D. Miss. 2011) (citing cases) (quoting, *inter alia*, *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989)).  Thus, its protection extends to anyone who has "assisted" or "participated in any manner" in Title VII proceedings. *Booker*, 879 F.2d at 1312 (quoting 42 U.S.C. § 2000e–3(a).  Hurt's provision of a written statement and agreement to testify on Glaser's behalf meets this broad definition of protected activity.

NSR notes that Hurt's written statement is not in evidence.  Yet, a reasonable juror could nonetheless credit Hurt's testimony that he provided one, as well as his explanation of its purpose and contents.  Construing the evidence in Hurt's favor, he has marshaled sufficient evidence to create a genuine issue as to this element.

### 2.    Decisionmaker's Knowledge of Protected Activity

NSR also argues Hurt cannot prove that any decisionmaker at NSR had actual knowledge of his protected activity.  In order to meet this requirement, Hurt must show that a decisionmaker responsible for his termination specifically knew of Hurt's involvement in Glaser's proceeding.  *Evans v. Prof'l Transp., Inc.*, 614 F.Appx. 297, 300-301 (6th Cir. 2015); *see also Frazier v. USF Holland, Inc.*, 250 F.Appx. 142, 148 (6th Cir. 2007) ("The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation.") (citing *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002)).  "Circumstantial evidence can support a reasonable inference of the decisionmaker's knowledge if the evidence is comprised of 'specific facts' and not merely 'conspiratorial theories,' 'flights of fancy, speculations, hunches, intuitions, or rumors.'"  *Evans*, 614 F.Appx. at 300 (6th Cir. 2015) (quoting *Mulhall*, 287 F.3d at 552

(quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)).

Hurt did not personally notify any of his managers at NSR of the assistance that he was providing Glaser.  Instead, he relies on Glaser's testimony that she informed Merrell, who presided over Hurt's investigatory hearing, that Hurt had agreed to serve as a witness for her.

NSR objects to Glaser's testimony as hearsay—an "out-of-court statement used to prove the truth of the matter asserted."  *U.S. v. Ledbetter*, No. 2:15-CR-080, 2:14-CR-127, 2016 WL 1106856, at *3 (S.D. Ohio Mar. 21, 2016); *see also* Fed. R. Evid. 801.  Thus, NSR contends that Glaser's out-of-court statement to Merrell was "used to prove the specific content of what she allegedly told Merrell, which Merrell disputes."  (Doc. 20 at PageID# 3260.)  This contention, however, does not withstand scrutiny.

The specific content of Glaser's statement (the "matter asserted") is that Hurt agreed to testify on Glaser's behalf in support of her charge of discrimination.  But, Hurt does not offer Glaser's statement to prove that fact.  Rather, Hurt offers the statement to prove only that ***Merrell was told*** that Hurt agreed to provide testimony.  The fact that Merrell was on notice of Hurt's agreement is distinct from the fact that he agreed to testify—the latter of which may be adduced through Hurt's own testimony.

NSR also argues that Glaser's testimony should be rejected as a "patent sham."  (Doc. 20 at PageID# 3261, citing *Partin v. Telxon Corp.*, No. C-1-98-503, 2001 U.S. Dist. LEXIS 25181, at *9 (S.D. Ohio June 25, 2001).)  NSR claims there are contradictions between her March 3, 2018 deposition and her October 4, 2019 deposition.  Namely, Glaser did not mention in her 2018 deposition that she told Merrell about Hurt's

14

agreement to testify. (Doc. 20-1 at PageID# 3275.) In contrast, during her 2019 deposition, Glaser specifically testified that she told Merrell that Hurt would be a witness supporting her EEOC charge. (Doc. 17 at PageID# 2401.)

To label the difference between Glaser's 2018 deposition and 2019 deposition a contradiction is inaccurate. In the 2018 deposition, Glaser was not asked whether she told Merrell anything about Hurt. That makes sense because the 2018 deposition was taken in a case that she brought against NSR. The 2019 deposition, which contains testimony about Hurt, was taken in this case. The difference might be fodder for cross-examination, but it is not a contradiction that warrants the rejection of Glaser's 2019 deposition testimony.

NSR also argues that, even if Glaser told Merrell about Hurt, that fact is immaterial because Merrell was not a decisionmaker. NSR contends that Superintendent Carl Wilson was the true decisionmaker because he reviewed the appeal of Hurt's termination. NSR is correct that "[a]n employment decision cannot be caused by protected activity if the decisionmaker did not know about the protected activity." *Crane v. Mary Free Bed Rehab. Hosp.*, 634 F. App'x. 518, 526 (6th Cir. 2015). NSR's view of what constitutes a decisionmaker, however, is too narrow.

In *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753 (6th Cir. 2015), the Sixth Circuit, sitting *en banc*, grappled with the issue of who is a decisionmaker in a retaliation case. The plaintiff in *Ford Motor Co.* alleged that she was terminated in retaliation for making a charge of disability discrimination. In response, the employer produced evidence that she was terminated because she was a poor performer. In order to show pretext,

plaintiff argued that meetings with her supervisor, during which she felt threatened, were evidence that she was actually terminated due to a retaliatory animus.

The majority held, in part, that the meetings could not establish pretext because the supervisor was a "*non* decisionmaker." *Ford Motor Co.*, 782 F.3d at 768. It first noted that, when plaintiff was fired, the supervisor was on vacation. *Id.* In addition, "[a]nd critically (and undisputedly), no one at Ford consulted with him or received a recommendation from him before making its termination decision." *Id.* Therefore, the supervisor was, "by definition … a nondecisionmaker outside of [the] decisionmaking process." *Id.* The Sixth Circuit acknowledged that the supervisor "had an *effect*" on plaintiff's termination because, of course, "[h]e oversaw her overall poor performance and reported her failures during the performance-enhancing plan to his supervisors." *Id.* Nevertheless, the evidence still did not show the supervisor was directly involved in the termination decision. Consequently, the supervisor's conduct could not be imputed to the decisionmakers who fired plaintiff.[2]

In this case, it is undisputed that Merrell presided over Hurt's hearing, found that he violated the safety rules and engaged in insubordination, and recommended his termination. (Doc. 11-3 at PageID# 762.) Thus, unlike the supervisor in *Ford Motor Co.*, Merrell was directly involved in Hurt's termination. He was therefore a decisionmaker and Hurt has carried his burden as to this element.

---

[2] Justice Karen Nelson Moore authored a dissenting opinion, in which four other justices joined. That opinion did not take issue with the majority's definition of a decisionmaker. Instead, it argued that a genuine issue existed concerning whether plaintiff's supervisor was a decisionmaker. *Ford Motor Co.*, 782 F.3d at 784. The dissent also held that the supervisor's actions implicated a "cat's paw" theory of liability that is not relevant here. *Id.* at 785.

### 3.    The Causal Link Between the Protected Activity and Termination

There is no dispute that Hurt suffered an adverse employment action.  The only remaining element in Hurt's prima facie case is whether he can show a causal connection between his protected activity and his termination.  To establish such a link, Hurt must show that the adverse action would not have occurred but for his protected activity.  *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Hurt first seeks to establish this element through the temporal proximity between his agreement to testify and his termination.  The Sixth Circuit has held that "'[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity,' such temporal proximity alone may satisfy the causal prong of a plaintiff's prima facie retaliation case."  *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 501-02 (6th Cir. 2013) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523–25 (6th Cir.2008)).  In those "limited" and "rare" cases, a causal connection may be inferred between the two actions without other evidence of retaliation.  *Id.*  "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."  *Id.* at 525.

Glaser informed Merrell that Hurt had agreed to serve as a witness sometime in December 2015.  (Doc. 11-1 at PageID# 94.)  Approximately three months later, on March 11, 2016, NSR suspended Hurt's employment and began the proceedings that resulted in his termination.  Hurt contends that this three-month period makes this one of the rare cases where temporal proximity alone is enough to infer causation.  He cites

*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004), in which the Sixth Circuit held a three-month period between the filing of a discrimination charge with the EEOC and plaintiff's termination was sufficient to infer causation.

NSR disputes Hurt's relevant timeline.  NSR argues that Hurt's termination date, not the date he was cited for safety violations, is the relevant end date.  There was no evidence, NSR contends, that the trainmasters who cited Hurt had any knowledge of his protected activity.  NSR is correct.  In addition, the adverse action was Hurt's termination, not the investigatory hearing into safety violations.  *See Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("an internal investigation is not an adverse employment action.").  The letter terminating Hurt's employment is dated April 19, 2015.  This makes his relevant period closer to four months.

This four-month period alone does not imply causation.  Too much time passed between Hurt's agreement to testify and his termination to infer causation on that basis alone.  Hurt therefore must produce some additional evidence supporting an inference of causation.  *See Blosser v. AK Steel Corp.*, 520 F. App'x 359, 364 (6th Cir. 2013); *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986).  For additional evidence, Hurt refers to his argument that NSR's proffered reasons for his termination are pretextual. The Court therefore turns to that evidence now.

> **B.    Whether Hurt Can Establish that NSR's Proffered Reason for His Termination was Pretextual**

Under the *McDonnell Douglas* burden-shifting analysis, NSR has met its burden of presenting non-retaliatory reasons for Hurt's termination—the reasons stated in the

termination letter. The final question is whether Hurt could convince a reasonable juror that those reasons are really a pretext for a retaliatory animus. For the reasons below, the Court finds Hurt is unable to do so.

"[A] plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Rischv. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)). "Under the first and third methods of showing pretext, the fact finder may infer discrimination from the circumstances." *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 589 (6th Cir. 2002) (internal citation omitted). "Under the second method, [the plaintiff] may not rely exclusively on his prima facie evidence, but instead must introduce some further evidence of discrimination." *Id.* (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000)).

The Sixth Circuit has noted that, "'[w]ithout a showing of discrimination, a bad decision to terminate an employee will not win a Title VII case.'" *Galbraith v. N. Telecom, Inc.*, 944 F.2d 275, 280 (6th Cir. 1991) (quoting *Jones v. Continental Corp.*, 789 F.2d 1225, 1233 (6th Cir. 1986)). In fact, "[a] reason is legitimate for purposes of the civil rights laws if it is nondiscriminatory, even if it is mean-spirited, ill-considered, inconsistent with humane personnel policies, or otherwise objectionable." *Id.* "[A]n employee's work violations constitute a legitimate, nondiscriminatory reason for adverse employment decisions." *Walborn v. Erie Cnty. Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998). Moreover, if an employer demonstrates an honest belief in its proffered

nondiscriminatory reason for discharging an employee, the employee cannot establish pretext just because that reason is ultimately shown to be incorrect. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). Under the Sixth Circuit's "modified honest-belief doctrine," an employer can avoid a finding of pretext where it can "establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Russell v. Univ. of Toledo*, 537 F.3d 596, 605 (6th Cir.2008) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)).

Hurt attempts to create a genuine issue regarding pretext by arguing NSR's stated reasons have no factual basis and were not the real reason for his termination. He does not appear to claim that his conduct was insufficient to warrant termination, although he does argue he was treated more harshly than other NSR employees.

### 1. There is no triable issue regarding whether NSR's stated reasons for Hurt's termination had a factual basis.

Here, applying the first method to show pretext, Hurt argues that the stated reasons for his termination have no basis in fact. While he admits that he violated the rule prohibiting the operation of the hand brake on moving equipment, he denies that he fouled any equipment. Hurt submits that "fouling equipment" requires him to have placed himself in a position to be struck by such equipment, something that he denies having done. Despite Hurt's assertion, the Public Law Board noted that, based on Hurt's location at the time of the violation, the trainmasters "determined that if he were to trip or otherwise stop moving, he would be struck by equipment." (Doc. 11-6 at PageID# 1607.) Moreover, NSR notes that Hurt was charged with violating Rule 22(a),

20

which is titled "Fouling Equipment." The rule states, in pertinent part: "Never make adjustments to moving equipment." (Doc. 11-5 at PageID# 1389.) From this language, it may be inferred that the drafters of the rule took a conservative approach to defining fouling equipment to avoid workplace injury.

Hurt also challenges the finding that he was insubordinate. He claims he did not refuse to provide a written statement, but only asked to have union representation first. He further contends that all union employees are entitled to "union representation at investigatory interviews which the employee reasonably believes may result in disciplinary action against him." *N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251, 267 (1975). At deposition, Merrell agreed that Hurt should be allowed to speak to a union representative before writing a statement, "[a]s long as it's in a timely manner. I mean, we're not going to wait until three days from the incident. It's a matter under investigation. It needs to be done, you know, then." (Doc. 14 at PageID# 1911.)

In response, NSR notes that Hurt never provided a written statement—not the day of the incident or at any time thereafter. NSR also takes issue with the contention that Hurt had a right to union representation before providing a statement. The Public Law Board addressed this issue, finding "the general rule is 'obey now and grieve later.' Failure to do so may subject the employee to discipline, including dismissal. In the instant case, [Hurt] should have been well-aware of the risk inherent in refusing to comply with instructions." (Doc. 11-6 at PageID# 1608.) NSR cites Public Law Board decisions specifically addressing the issue of whether railway employees have the same *Weingarten* rights as employees covered by the NLRA. In sum, due to the different

language used in the NLRA and the Railway Labor Act, railway employees do not have the same rights. (*See* Docs. 20-2, 20-3.)

Hurt also claims that he was not insubordinate by leaving the office during his interview with Tucker and Stuckey. Hurt claims that he understood Stuckey's instruction to mean he should not leave the yard office building, not the particular office that he was sitting in at that moment. (Doc. 11-1 at PageID# 260-61.) Therefore, when he went outside to call his union representative, Hurt believed that he was still abiding by Stuckey's instruction. NSR cites other deposition testimony by Hurt suggesting that he understood "office" in the same way that most people would—the room where he was sitting. (*Id.* at PageID# 262.) While NSR's point is well-taken, the Court must leave the credibility of Hurt's assertion to the factfinder. That is not say, however, that Hurt's (perhaps unreasonable) understanding of Stuckey's instruction supports an inference that the insubordination finding had no basis in fact. It does not. The finding was based on Hurt's failure to follow an instruction that the trainmasters considered "clear and [unambiguous]." (Doc. 11-6 at PageID# 1608.) The Public Law Board clearly credited the trainmasters' view over Hurt's competing testimony. (*Id.*) These are fact-based assessments; there is no indication that any determination in the disciplinary process was not grounded in facts in the record.

### 2. Whether NSR terminated Hurt for its stated reasons.

Hurt also asserts NSR did not terminate him for the reasons stated in its decision. One of Hurt's arguments is that NSR allowed other similarly situated employees to keep their jobs after committing equally or far more serious violations of the safety

rules.  In particular, he cites the disciplinary records of following three individuals:

- A.T. Schwartz - Between 2009 and 2014, NSR charged Mr. Schwartz with four minor offenses, three serious offenses, and a major offense. (Merrell Dep. Ex. 41, Doc. 14-1, PageID# 1947-1948). His transgressions included operating a handbrake on a moving car, dismounting moving equipment, fouling equipment, a derailment, walking backwards with a brake stick, and leaving train cars unattended in the yard, causing damage to equipment and blocking a route. (*Id*.). According to his service record, he remains an NSR employee.

- K.D. Doud - In 2008, Mr. Doud was responsible for a derailment that injured a co-worker. (Merrell Dep. Ex. 40, Doc. 14-1, PageID# 1946). In 2015, he caused a second derailment. (*Id*.) He was also separately charged with operating a hand brake from the ground. (*Id*.) According to the record, Mr. Doud was not terminated.

- B.W. Hensley - Mr. Hensley received a minor violation for fouling equipment, received a suspension for causing a collision and major derailment, several minor violations for mounting or dismounting moving equipment, and a serious violation for causing damage to equipment while switching cars. (Merrell Dep. Ex. 39, Doc. 14-1, PageID# 1944). According to the record, Mr. Hensley was not terminated.

(Doc. 18 at PageID# 3244.)  Hurt asserts that these men worked out of the Cincinnati terminal, which encompasses the Sharonville yard, and were all categorized as "CONDUCTOR/TRAINMAN/SWITCHMAN" like Hurt.  They also worked in the bargaining unit and were subject to the same disciplinary process as Hurt.  (Doc. 11-1 at PageID# 525-529.)

In order for employees to be considered similarly situated, the plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Rather, "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the relevant aspects.'"  *Id*.  NRS contends that

Schwartz, Doud and Henley did not have records that were "substantially identical" to that of Hurt and therefore are not relevant comparators. (Doc. 20 at PageID# 3271, citing *White v. Ohio*, No. 99-4359, 2 F. App'x 453, 460-61 (6th Cir. 2001).) NSR points out that none of these three men had three violations in one day, as did Hurt.

It is also significant that none of the men were charged with insubordination while Hurt was found to have committed two such acts. Insubordination is a materially different kind of violation. As the Public Law Board observed, "Like any other hierarchical private business organizations, railroads require a chain of command if they are to operate efficiently." (Doc. 11-6 at PageID# 1608.) An act of insubordination threatens the chain of command in a more fundamental manner than do independent acts of negligence. That none of the employees identified by Hurt were guilty of insubordination makes their disciplinary records irrelevant.

Hurt also claims that he was subjected to increased scrutiny after agreeing to testify for Glaser. There is no direct evidence, however, that trainmasters actually increased their monitoring of Hurt—it is only Hurt's testimony as to what he perceived. Nor is there any direct evidence that anyone other than Merrell knew about Hurt's agreement. Hurt speculated that the trainmasters and other supervisors knew about his agreement because they had the ability to surreptitiously listen to employees' conversations over a two-way radio. It is well settled in the Sixth Circuit that "mere personal beliefs, conjecture and speculation are insufficient to support an inference of . . . discrimination." *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) (internal quotes omitted) (cleaned up). Hurt's speculation that knowledge of his

agreement was widespread, and therefore everyone was watching him, cannot create a genuine issue of material fact.

Hurt makes a couple arguments attacking Merrell's impartiality. First, he asserts that Merrell could not act as a fair and impartial hearing officer because he was consulted as events unfolded on March 11, 2016. During Tucker and Stuckey's interaction with Hurt, Stuckey called Merrell twice. Stuckey called once from the customer site to discuss the violations and the second time to discuss what took place in the yard office. Although Stuckey's and Tucker's written statements both recounted these calls, neither of them testified to the calls at the investigatory hearing. Hurt suggests that the omission of these calls from the hearing is suspicious and, had they been raised, Merrell would not have been allowed to preside as the hearing officer.

This critique of the disciplinary process is not ungrounded. Merrell could have been privy to information that was not part of the record, which presents the risk that his recommendation could be based on unreviewable facts. There are no allegations, however, that material facts concerning Hurt's conduct were not presented at the hearing. The phone calls to Merrell were tangential to what occurred on March 11.

Moreover, the fact that NSR's process was imperfect does not create an inference of pretext. *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998) (employer need not show that the "decisional process" was "optimal" or "that it left no stone unturned" to warrant summary judgment). "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* As discussed above, Merrell was a decisionmaker because he was directly

involved in the process and recommended termination.  But, Merrell was not the only decisionmaker or the final decisionmaker.  His recommendation was reviewed by Superintendent Carl Wilson, who made the final decision to terminate Hurt's employment.  That decision was appealed through the company and ultimately to a Public Law Board composed of three members.  There is no evidence that any decisionmaker, other than Merrell, knew about Hurt's agreement to testify.  In sum, the fact that Merrell presided over the hearing does not undermine the substantial evidence that NSR honestly and reasonably relied on the facts before it (and in the record) when it terminated Hurt.  *Ladd v. Grand Trunk Western R.R.*, 552 F.3d 495, 503 (6th Cir. 2009) ("Even if all of [plaintiff]'s white co-workers did lie on [her co-employee]'s behalf, [her employer] is not liable if it acted upon an honest belief in its non-discriminatory reason and made a reasonably informed and considered decision.").

Hurt's second argument regarding Merrell may be quickly dismissed.  He seeks to impugn Merrell's character by introducing the statement of another NSR employee.  In the statement, the employee claims that Merrell instructed him to falsify evidence against an engineer involved in an altercation with a trainmaster.  The employee's out-of-court statement is hearsay because it is being offered for the truth of the matter asserted—that Merrell told the employee to lie in a disciplinary proceeding.  Hurt does not identify any exception to the hearsay rule that would apply.  And, under Fed. R. Evid. 608, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack his character for truthfulness.  The rule permits inquiry on cross-examination of the witness, but, in this case, Merrell already testified that he does

not have any recollection of the employee's statement or the allegations contained therein. The Court therefore rejects any inference of pretext from Merrell's alleged instruction to another employee to falsify evidence.

None of Hurt's attempts to create a genuine issue regarding pretext is successful. Whether he could establish a prima facie case, which admittedly "is not onerous," is therefore immaterial because without a showing of pretext his claim cannot survive summary judgment. *Jackson v. Fed. Express Corp.*, 518 F.3d 388, 392 (6th Cir.2008) (quoting *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

## CONCLUSION

For the reasons above, the Court **GRANTS** NSR's Motion for Summary Judgment (Doc. 11). This case shall be **TERMINATED** on the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _Matthew W. McFarland_
JUDGE MATTHEW W. McFARLAND

27